TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-02-00001-CV





Reliant Energy, Incorporated and American Electric Power Company, Appellants


v.


Public Utility Commission of Texas, Appellee







DIRECT APPEAL FROM THE PUBLIC UTILITY COMMISSION OF TEXAS





O P I N I O N




 In this direct appeal, we must determine whether the Public Utility Commission erred
in promulgating a rule governing stranded-cost recovery for formerly regulated electric utilities. See
Tex. Util. Code Ann. § 39.001(e), (f) (West Supp. 2003). Stranded costs represent prudently
incurred expenditures made by the utilities during regulation--previously recoverable over time
through regulated rates--that have become unrecoverable in a deregulated market. Utilities are
permitted to recover their stranded costs as part of the transition to competition in Texas. Reliant
Energy, Incorporated and American Electric Power Company ("AEP") argue that the Public Utility
Commission (1) exceeded its authority by promulgating portions of substantive rule 25.263, which
governs the proceeding where the Commission is to determine whether a utility actually has stranded
costs and to reconcile a utility's actual stranded costs with amounts already recovered based on
previous estimates. We hold that the Commission exceeded its authority in promulgating some of
the challenged portions of its rule and reverse and remand those portions to the Commission for
further proceedings in accordance with this opinion. See Tex. Util. Code Ann. § 39.001(f). We
affirm the remaining portions of the rule as enacted. See id.


BACKGROUND


 In 1975, the legislature enacted the Public Utility Regulatory Act (PURA) creating
the Public Utility Commission and establishing a comprehensive regulatory regime for electric
utilities. At that time, it was thought that electric utilities were natural monopolies, immune from
the normal forces of competition. Under the regulatory regime created by PURA, each utility was
allowed to operate as a monopoly in the area it served but was prohibited from charging monopoly
prices. The Commission was authorized to set rates for each utility at a level that would allow it to
recoup its prudently incurred costs and to earn a reasonable return on its investments. (2) See 16 Tex. 
Admin. Code §§ 25.231, .235(a) (2002); see also Central Power & Light Co. v. Public Util.
Comm'n, 36 S.W.3d. 547, 553 (Tex. App.--Austin 2000, pet. denied) (describing utility ratemaking
procedure under regulation).

 When the legislature enacted PURA most electric utilities were large vertically
integrated companies that produced, transported, and retailed electricity. In truth, only one
component of a vertically integrated electric utility immunizes it from the normal forces of
competition--its transmission and distribution infrastructure. Recognizing this, the legislature
amended PURA in 1999 and partially deregulated the industry. Among its "policies and purposes,"
the legislature found that:


[T]he production and sale of electricity is not a monopoly warranting regulation of
rates, operations, and services and that the public interest in competitive electric
markets requires that, except for transmission and distribution services and for the
recovery of stranded costs, electric services and their prices should be determined by
customer choices and the normal forces of competition.



Tex. Util. Code Ann. § 39.001(a) (West Supp. 2003).

 Chapter thirty-nine of PURA governs the restructuring of the electric-utility industry. 
As of January 1, 2000, each privately owned electric utility was required to "unbundle" or separate
into the following entities: a power generation company, a retail electric provider, and a transmission
and distribution utility. See id. § 39.051(b) (West Supp. 2003). The former vertically integrated
utilities can now operate as holding companies that own affiliated unbundled entities. See id.
§ 39.051(c) (West Supp. 2003). Under deregulation, the power generation and retail markets are to
be governed by "customer choices and the normal forces of competition," while the Commission is
to continue to regulate transmission and distribution utilities. See id. § 39.001(a). The Commission
is also charged with facilitating stranded-cost recovery for the formerly regulated utilities. See id.

 Chapter thirty-nine defines stranded costs as "the positive excess of the net book
value of generation assets over the market value of those assets. . . ." See id. § 39.251(7) (West
Supp. 2003). The basic concept of stranded costs is straightforward. Under regulation, a utility
could recover over time its prudently incurred costs of acquiring power-generation assets through
rates approved by the Commission and paid by captive customers. See Central Power & Light Co.,
36 S.W.3d at 552-53. The Commission facilitated this cost recovery by incorporating depreciation
expenses into approved rates. See id. at 53. But in a deregulated environment, it was thought that
competition might drive rates to levels so low that a formerly regulated utility would be unable to
recoup its investments. Stranded costs represent that portion of the net book value of a utility's
generation assets not yet recovered through depreciation that has become unrecoverable in a
deregulated environment. See City of Corpus Christi v. Public Util. Comm'n, 51 S.W.3d 231, 237-38 (Tex. 2001); Tex. Util. Code Ann. § 39.251(7).

 Chapter thirty-nine sets out a three-stage program for the recovery of stranded costs. 
In the first stage, from September 1999 to December 2001, the Commission froze retail electric rates. 
See Tex. Util. Code Ann. §§ 39.052(a), .254-.256 (West Supp. 2003). During this stage, utilities
identified as having probable stranded costs (3) were required to "mitigate" them through various
measures intended to reduce the book value of their generation assets. See id. They could shift
depreciation from transmission and distribution assets to generation assets, id. § 39.256; they could
keep earnings in excess of the allowed rate of return, id. § 39.254. These utilities were also allowed
to "securitize" a portion of their estimated stranded costs by selling transition bonds and using the
proceeds to reduce the book value of their generation assets. See id. §§ 39.301-.313 (West Supp.
2003). The costs of issuing and servicing transition bonds are borne by all retail customers in a
utility's service area through a nonbypassable "transition charge." See id. §§ 39.302(7), .303(b), (c);
City of Corpus Christi, 51 S.W.3d at 239. Because the Commission estimated in 1998 that the
appellant utilities would have significant stranded costs in a deregulated environment, each utility 
used the available mitigation procedures and securitization to reduce the book value of their
generation assets during this stage of PURA's stranded-cost recovery program. (4) 

 The second stage began on January 1, 2002, the first day of competition. See Tex.
Util. Code Ann. §§ 39.001(b)(1), .201 (West Supp. 2003). During this stage, the Commission was
authorized to set a nonbypassable "competition transition charge" to allow utilities to recover any
stranded costs remaining after the mitigation procedures and securitization utilized in stage one. See
generally id. § 39.201. Any competition transition charge was to be included in the tariffs of a
utility's affiliated unbundled transmission and distribution utility. See id. § 39.201(b)(3). In
determining whether to set such a charge, the Commission was required to revise its previous
stranded-cost estimates using "updated company-specific inputs." See id. § 39.201(h).

 In preparation for the rate hearings for the transmission and distribution utilities to
be held in 2001, the stranded cost estimates were updated. The Commission's updated estimates
unexpectedly reflected that the utilities would have no stranded costs. (5) A substantial increase in
natural gas prices in 2000 had driven the market value of the utilities' generation assets well above
their book value. These new estimates therefore indicated that some utilities had been
overcompensated by their earlier mitigation procedures and securitization. 

 In light of these revised estimates, the Commission issued orders requiring the
utilities to discontinue all mitigation efforts, to reassign the depreciation transferred from
transmission and distribution assets back to those assets, and to return monthly "excess mitigation
credits" to retail providers and their ratepayers. The Commission did not, however, require the
utilities to refund the amounts they had received from selling transition bonds, and by statute it could
not alter the transition charge that had been imposed on ratepayers to service the bonds. See id.
§ 39.303(d) (Transition charge authorized in financing order is "irrevocable and not subject to
reduction, impairment, or adjustment by further action of the commission . . . ."). Utilities that had
sold transition bonds to recover stranded costs no longer anticipated would seem to have received
a windfall at the ratepayers' expense.

 The third and final stage of stranded-cost recovery is yet to occur. This stage requires
the Commission to conduct a "true-up proceeding" sometime after January 10, 2004, to determine
whether a utility actually has remaining stranded costs. See id. §§ 39.201(l), .262(c) (West Supp.
2003). The challenged rule governs the conduct of this true-up proceeding. See 16 Tex. Admin.
Code § 25.263 (2002). The goal of the true-up proceeding in this third stage is to determine the
utility's actual stranded costs and to reconcile or true up this determination with its previous
estimates. See Tex. Util. Code Ann. §§ 39.201(l), .262(c). This final determination is to be based
on a new calculation of the value of a utility's generation assets made under actual competitive
conditions. See id. The Commission is required to subtract the market value of a utility's generation
assets from the book value of those assets. (6) See id. §§ 39.251(7), .252(a), .262(c), (h), (i) (West
Supp. 2003). If the calculation yields a positive number, i.e., if the book value of the assets exceeds
their market value, then the utility has stranded costs it is entitled to recover. If the calculation yields
a negative number, i.e., if the market value of the assets exceeds their book value, the utility has no
stranded costs--and chapter thirty-nine does not provide for any return to ratepayers of so called
"negative stranded costs." If this true-up proceeding reveals that the utilities over-recovered
estimated stranded costs through their earlier mitigation efforts, the Commission can make
appropriate adjustments by, among other things, reducing the unbundled transmission and
distribution utility's rates. See id. § 39.201(l). The Commission cannot, however, reduce the
transition charge imposed on ratepayers to service transition bonds. See id. § 39.303(d).

 In addition to finalizing stranded costs, chapter thirty-nine also requires that the
Commission make several other "true-up" calculations in the 2004 proceeding that could affect
customer rates. See id. § 39.262(d)-(g) (West Supp. 2003). These calculations reconcile previous
estimates with known values in various areas and result in either credits or bills to the transmission
and distribution utility from its affiliated power generation company or retail electric provider. See
generally id. Based on these credits or bills, the transmission and distribution utility is to make
adjustments to its nonbypassable delivery rates. See id. § 39.262(g).

 One of these several other true-up calculations involves the determination of a
utility's final fuel balance. See id. §§ 39.202(c), .262(d)(1) (West Supp. 2003). In the 2004
proceeding, the Commission must true up the actual cost of fuel incurred by the utility against the
prior estimate used to set the "fuel factor" component of regulated rates during the final period of
traditional regulation. See id. A positive fuel balance represents money owed to the utility for
under-recovered fuel costs. (7) See id. The challenged portion of rule 25.263 would reduce this
positive fuel balance owed to the utility by any negative stranded-cost calculation--regardless of
whether the negative calculation was caused by market forces or by previous over-recovery through
securitization. See 16 Tex. Admin. Code § 25.263(l).

 The utilities argue that there is no such thing as negative stranded costs. They also
complain that the fuel balance is not a stranded cost and therefore cannot be "netted" against a
negative stranded-cost calculation. In other words, according to the utilities, the true-up proceeding
was never intended to reconcile a negative stranded-cost calculation against a positive fuel-balance
calculation to reduce the amount due to the utility for under-recovered fuel costs. The Commission
insists that it has a mandate to prevent a utility from receiving an over-recovery of stranded costs and
that offsetting sums due for a positive fuel balance is a permissible means of reversing an over-recovery of stranded costs achieved through securitization. We begin our analysis by examining how
the rule works.


THE RULE

 Rule 25.263 requires the relevant portion of the true-up proceeding to be conducted
in four steps. First, the Commission subtracts the newly calculated market value (8) of the utility's
generation assets from the net book value of those assets. According to the statute, if this number
is positive, the utility has recoverable stranded costs; if it is negative, the utility has no stranded
costs. (9) See Tex. Util. Code. Ann. §§ 39.251(3), (7), .252(a) (West Supp. 2003). A negative number
may be due to over-recovery of stranded costs that reduced the book value of assets during the first
stage, but it may also result from unrelated market conditions that increased the market value of the
assets.

 Second, the Commission calculates the utility's final fuel balance, which is the
difference--positive or negative--between the estimated cost of fuel that was used to set the utility's
rates for the final period of regulation and the actual cost of fuel for that period. Under the prior
regulatory regime, this amount would have been included--as a credit or charge--in the rates set at
the utility's next ratemaking proceeding. Under the challenged section of rule 25.263, this final fuel
balance is netted against the actual stranded costs determined in step one. Thus, a negative stranded
cost calculation could reduce or eliminate a positive fuel balance owed to the utility.

 Third, the Commission calculates a "capacity-auction true-up" amount, which is the
difference between the price the utility, or its unbundled power generation affiliate, was estimated
to obtain for its power on the wholesale market in the second stage and the price the utility actually
received during the first two years of competition. See 16 Tex. Admin. Code §§ 25.263(i), (l)
(2002). The actual market price is reflected in "capacity auctions" in which the utility sold its
entitlements to generation capacity to reduce its market share as a part of the transition to
competition. See Tex. Util. Code Ann. §§ 39.153, .156 (West Supp. 2003). The capacity-auction
true-up amount must then be netted against the amount reached in step two by netting the stranded
costs determined in step one with the fuel balance.

 Fourth, and finally, the Commission will conduct a prudence review of regulatory
assets (10) not previously approved in a prior Commission rate order but being recovered through
securitization in the form of a transition charge or through a competition transition charge imposed
during the second stage of stranded-cost recovery. See 16 Tex. Admin. Code § 25.263(l) (2002). 
If the Commission determines that these assets were not prudently incurred, it will subtract them
from the true-up balance as determined in steps one through three. If the resulting final true-up
balance is positive, the utility will be entitled to recover that amount through a competition transition
charge assessed to its transmission and distribution customers. See id. § 25.263(l)(2)(A). If
negative, the Commission will (1) reverse any existing competition transition charge, then (2)
reverse any remaining mitigation proceeds, then (3) impose on utilities that have sold transition
bonds a negative competition transition charge based on the lesser of the absolute value of the
remaining negative true-up balance or the amount the utility has securitized. See id.
§ 25.263(l)(2)(C).


DISCUSSION


 This is a direct challenge to the validity of a chapter thirty-nine competition rule. See
Tex. Util. Code Ann. § 39.001(e). The utilities allege that certain portions of the rule exceed the
Commission's statutory authority. (11) See id.; see generally City Pub. Serv. Bd. v. Public Util.
Comm'n, No. 3-00-007-CV, slip op. at 8, 2002 Tex. App. LEXIS 2059, at *12 (Tex. App.
Austin--Mar. 21, 2002, no pet.). An administrative agency has only those powers conferred upon
it by clear and unmistakable language. Public Util. Comm'n v. City Pub. Serv. Bd., 53 S.W.3d 310,
315-16 (Tex. 2001). When the legislature expressly confers a power on an agency, it also impliedly
intends that the agency have whatever powers are reasonably necessary to fulfill its express functions
or duties. Public Util. Comm'n v. GTE-Southwest, Inc., 901 S.W.2d 401, 407 (Tex. 1995). An
agency may not, however, exercise what is effectively a new power on the theory that such exercise
is expedient for the agency's purposes. Id. at 407. We must therefore determine whether the
Commission had either the express or implied authority to promulgate the challenged aspects of its
rule that will govern the 2004 true-up proceedings.


Netting

 PURA provides that "[a]n electric utility is allowed to recover all of its net, verifiable,
nonmitigable stranded costs incurred in purchasing power and providing electric generation service." 
Tex. Util. Code Ann. § 39.252(a). The utilities challenge the Commission's authority to net a
utility's final stranded-cost calculation with other true-up items such as a utility's final-fuel balance. 
The Commission defends its rule arguing that (1) these other true-up items are themselves potential
stranded costs and, (2) even if they are not, netting is a permissible means of preventing over-recovery of stranded costs by those utilities that received a windfall through securitization.

 PURA defines stranded costs as follows: 


"Stranded costs" means the positive excess of the net book value of generation assets
over the market value of those assets, taking into account all of the electric utility's
generation assets, any above market purchased power costs, and any deferred debit
related to a utility's discontinuance of the application of Statement of Financial
Accounting Standards No. 71 [i.e., unrecovered regulatory assets].



Tex. Util. Code Ann. § 39.251(7). PURA further defines generation assets as follows:


"Generation assets" means all assets associated with the production of electricity,
including generation plants, electrical interconnections of the generation plant to the
transmission system, fuel contracts, fuel transportation contracts, water contracts,
lands, surface or subsurface water rights, emissions-related allowances, and gas
pipeline interconnections.



Id. § 39.251(3).

 As described above, at the true-up proceeding, the Commission is required to
calculate a utility's actual stranded costs by subtracting the market value of its generation assets from
their book value. If this number is negative, i.e., if the market value of those assets exceed their book
value, it is undisputed that the utilities are not required to refund this negative amount to the
ratepayers. Under chapter thirty-nine, there is simply no concept of negative stranded costs and no
consequence of a negative calculation. 

 Chapter thirty-nine defines stranded costs as "the positive excess of net book value
of generation assets over the market value of the assets." See id. § 39.252(7) (emphasis added). 
Because we presume that each word in a statute has meaning, the word "positive" must be given
effect. See Southwestern Life Ins. Co. v. Montemayor, 24 S.W.3d 581, 584 (Tex. App.--Austin
2000, pet. denied). Stranded costs therefore exist only when the book value of a utility's generation
assets exceeds their market value. If book value is equal to or less than market value, then there are
no stranded costs. The term "negative stranded costs" appears nowhere in chapter thirty-nine, and
there are no statutory provisions providing for recovery by ratepayers of the excess market value over
cost.

 The fact that chapter thirty-nine does not recognize the concept of negative stranded
costs motivates the Commission's argument that all the true-up items represent stranded costs and
that the netting required under its rule will determine actual stranded costs. The utilities protest that
the other true-up items do not comprise stranded costs as they are defined in chapter thirty-nine and
cannot be offset by a negative stranded-cost calculation. They focus particularly on showing that the
final-fuel balance has nothing to do with stranded costs. The Commission responds by arguing that
because coal, gas, nuclear, and other types of fuel are "indisputably assets associated with the
production of electricity," they constitute generation assets that could become stranded. We reject
the Commission's attempt to define these items as stranded costs.

 Under the prior regulatory regime, the approved rates for a utility always included a
"fixed fuel factor," which was based on a projection of future fuel costs. 16 Tex. Admin. Code
§ 25.237 (2002). The Commission periodically adjusted this fuel factor, and at least every three
years the fuel revenues the utility received under the factor were "reconciled" with the fuel costs the
utility actually incurred. See Tex. Util. Code § 36.203 (West 1998); 16 Tex. Admin. Code § 25.236
(2002); see also Nucor Steel v. Pub. Util. Comm'n, 26 S.W.3d 742, 744-45 (Tex. App.--Austin
2001, pet. denied). Chapter thirty-nine, section 36.202(c) simply postpones the fuel reconciliation
for the final period of regulation until the 2004 true-up proceeding, at which time any under-recovered fuel balances will be surcharged.

 The statutory structure of chapter thirty-nine also indicates that the legislature did not
consider a final fuel balance to be a stranded cost. Stranded costs and the final fuel balance are
determined and recovered under separate sections of chapter thirty-nine. 

 Stranded costs are determined and recovered under sections 39.201(l) and 39.262(c). 
Section 39.201(l) provides: "[t]wo years after customer choice is introduced, the stranded cost
estimate under this section [i.e., the stage-two stranded-cost estimate] shall be reviewed and, if
necessary, adjusted to reflect a final, actual valuation in the true-up proceeding under Section
39.262." Tex. Util. Code Ann. § 39.201(l). Section 39.262(c) provides:


After January 10, 2004 . . . each transmission and distribution utility, its affiliated
retail electric provider, and its affiliated power generation company shall jointly file
to finalize stranded costs under Subsections (h) and (i) and reconcile those costs with
the estimated stranded costs used to develop the competition transition charge in the
proceeding held under Section 39.201.



Id. § 39.262(c). Subsections (h) and (i) set out methods for quantifying the market value of a utility's
generation assets and calculating its stranded costs. Significantly, the final fuel balance does not
figure into this calculation.

 Under-recovered fuel costs are determined and recovered under section 39.202(c) and
39.262(d)(1). Section 39.202(c) provides: "[a]fter the date of customer choice, each affiliated power
generation company shall file a final fuel reconciliation for the period ending the day before the date
customer choice is introduced . . . [which will be] included in the true-up proceeding." Id.
§ 39.202(c). Section 39.262(d)(1) provides "the affiliated power generation company shall reconcile,
and either credit or bill to the transmission and distribution utility, the net sum of . . . the former
electric utility's final fuel balance . . . and [the capacity-auction true-up amount]." Id. § 39.262(c).

 Stranded costs and the final fuel balance are distinct concepts treated separately in
the statute. If the legislature wanted to define an under-recovered fuel balance as a stranded cost it
could have done so explicitly, or it could have easily included the impact of the final fuel
reconciliation in the market valuation of a utility's generation assets under section 39.262(c), (h), and
(i). The fact that the legislature treated the fuel balance separately shows that it did not intend it to
be a component of a stranded-cost calculation.

 The same is true of the other true-up items. The capacity-auction true-up amount is
the difference between the price the utility, or its unbundled power generation affiliate, was
estimated to obtain for its power on the wholesale market in the second stage of stranded-cost
recovery and the price the utility actually received during the first two years of competition.
Although there is a closer nexus between this true-up item and the final determination of stranded
costs, the legislature chose not to include this item in its definition of stranded costs or to incorporate
it into the methods it prescribes for calculating stranded costs. Moreover, the legislature specifically
mandated that this item be netted with the final fuel balance. Id. § 39.262(d).

 Chapter thirty-nine seems to contemplate two parallel true-up tracks--one for
stranded costs and one for the several other true-up items. Separate portions of chapter thirty-nine
govern the effects that the calculations under each track are to have on rates. Compare id.
§ 39.262(c), with id. § 39.262(g). Although the calculation under each track can be applied to adjust
the transmission and distribution utility's nonbypassable rates, the utilities are authorized to
securitize any remaining stranded costs but not positive balances associated with the other true-up
items. Id § 39.262(c). In some circumstances, performing two parallel true-up calculations, as the
statute provides, and performing a single true-up calculation that nets stranded costs against all the
true-up items, as the rule requires, would result in identical adjustments to rates. However, netting
the stranded-cost calculation with the other true-up items can cause an impermissible offset of
amounts due a utility whenever the market value of its generation assets exceed their book value, i.e.,
when it has no stranded costs. See generally id. §§ 39.252(a) (a utility is allowed to recover all its
net verifiable stranded costs), .262(c)-(i) (contemplating two parallel true-up tracks).

 We thus reject the Commission's argument that the other true-up items represent
stranded costs. We agree with the utilities that the statute does not contemplate a negative stranded-cost calculation and does not contemplate any consequence to ratepayers if the stranded-cost
calculation produces a negative number. The rule that would net a negative stranded-cost calculation
against a positive balance produced from the other true-up items is not authorized by the statute. 
Indeed, it directly contradicts the legislature's intent that a positive stranded-cost calculation has
significance while a negative calculation simply means that a utility is not entitled to recovery of
stranded costs. By collapsing two parallel true-up tracks into a combined calculation, the rule
impermissibly allows a negative stranded-cost calculation to offset positive balances due from other
true-up items. The statute does not require a utility to refund a negative calculation of stranded costs
to ratepayers and the Commission may not require such a refund by calling these other true-up items
stranded costs.


Reversing Securitization Over-Recoveries 

 We now turn to the Commission's claim that even so, netting the calculations is a
permissible means of preventing over-recovery of stranded costs by those utilities that received a
windfall through securitization. When the legislature provided for mitigation and securitization of
estimated stranded costs, it did so with the proviso that the Commission must ensure that no utility
over-recover its stranded costs. See id. § 39.262(a). The utilities that were estimated in the first
stage to have stranded costs received substantial sums of money or its equivalent through mitigation
and securitization proceeds. When the revised stranded-cost estimate showed that these utilities
were likely to have no stranded costs, the Commission required the utilities to disgorge their
mitigation proceeds through excess mitigation credits. As previously noted, however, the
Commission could not reverse the transition charge imposed on ratepayers to finance the bonds that
the utilities had sold. See id. §§ 39.201(l)(1), .303(d).

 When the legislature expressly confers a power on an agency, it also impliedly intends
that the agency have whatever powers are reasonably necessary to fulfill its express functions or
duties. Public Util. Comm'n, 53 S.W.3d at 316. Chapter thirty-nine requires the Commission to see
that utilities do not over-recover their stranded costs. The Commission argues that netting the
various true-up items is a permissible way to prevent over-recovery--effectively forcing the utilities
that sold transition bonds based on earlier invalid stranded-cost estimates to disgorge amounts to
which they are not entitled.

 While we agree with the Commission that it has the implied power to attempt to
reverse over-recovery of stranded costs through netting, we find its rule to be overbroad. An agency
may not exercise what is effectively a new power on the theory that such exercise is expedient for
the agency's purposes. GTE-Southwest, Inc., 901 S.W.2d at 407. The Commission's rule does not
limit the amount by which a negative stranded-cost calculation can offset other positive true-up
balances to a utility's previous over-recovery. See 16 Tex. Admin. Code. § 25.263(l). We hold that
the Commission has the discretion to net a negative stranded-cost calculation against the other true-up items only to the extent that the utility over-recovered stranded costs through securitization.

 For example, a utility that entered the first stage of stranded-cost recovery with
generation assets having a book value of 3x and an estimated market value of 1x would have been
required to mitigate or securitize estimated stranded costs of 2x. Assume that this utility sold
transition bonds and removed 2x from its books, reducing its book value to 1x. If the market value
of this utility's generation assets has risen to 3x at the time of the true-up proceeding, the updated
stranded-cost calculation will yield a negative 2x indicating that it has no actual stranded costs. But
to the extent the book value was reduced by the proceeds of securitization, the utility appears to have
over-recovered 2x when it received its bond proceeds. This is true because the original book value
of 3x would not have exceeded the increased market value of 3x, even had the utility never received
bond proceeds of 2x. The full 2x would represent an over-recovery of stranded costs that the utility
did not have. This amount, but no more, may be netted against other sums to prevent over-recovery.

 The Commission must conduct parallel true-up calculations for stranded costs and
the other true-up items. Only in those limited circumstances where a negative calculation of stranded
costs results from the reduction of book value by securitization may the Commission devise a rule
to offset any windfall received through securitization against the positive balance due the utility for
the other true-up items. If a utility's stranded-cost calculation would have been negative even if it
had never sold transition bonds, then the full amount of its bond proceeds represents an over-recovery which can be netted against the other true-up items. On the other hand, if a utility would
have had a positive stranded-cost calculation but for the fact that it sold the bonds, i.e., if it would
be entitled to recover stranded costs had it never reduced its book value through securitization, the
Commission is limited to netting the amount by which the bond proceeds exceeded the actual
stranded costs it would have recovered. (12) 

 Reliant argues that it should not be required to disgorge any over-recovery it may
have received through securitization. Its basic complaint seems to be that the Commission's rule
does not account for the fact that securitization substantially reduces the book value of a utility's
generation assets. We believe that our formulation--requiring the Commission to consider what a
utility's stranded-cost calculation would have been absent securitization--addresses this concern. (13)

 In no circumstances may a negative stranded-cost calculation attributable to market
conditions be netted against a positive fuel balance or other such true-up calculation. We sustain the
challenge to the rule because it does not limit the netting of negative stranded-cost calculations to
prevent over-recovery attributable to securitization. The Commission has the statutory authority to
prevent over-recovery of stranded costs through securitization. It has no statutory authority to net
negative stranded costs attributable to market forces. (14)


Partial Stock Valuation Method

 One of the Commission's most important responsibilities during the true-up
proceeding is to calculate the market value of a utility's generation assets. See generally Tex. Util.
Code Ann. § 39.262(h). Chapter thirty-nine sets out several different methods that the Commission
may use to make this calculation. See id. The utilities claim that the Commission exceeded its
authority in promulgating portions of its rule that implement "the partial stock valuation method." 
See generally id. § 39.262(h)(3); 16 Tex. Admin. Code § 25.263(f)(1)(C) (2002).

 The Commission is authorized to use the partial stock valuation method to establish
the value of generation assets when a utility has transferred some or all of those assets to affiliated
or nonaffiliated corporations and between nineteen and fifty-one percent of the common stock of
each such corporation is spun off and sold to public investors through a national stock exchange and
traded for one year or more. See Tex. Util. Code Ann. § 39.262(h)(3). The Commission is
authorized to calculate the value of the assets held by the transferee corporation, presumably an
unbundled power generation company, by adding the market value of its common stock to the book
value of its preferred stock and its debt. See id.; see generally 16 Tex. Admin. Code
§ 25.263(f)(1)(C)(viii).


A. Control Premium

 The average daily closing price over thirty consecutive trading days, chosen by the
Commission, with some constraints, is generally presumed to establish the market value of the
common stock. See Tex. Util. Code Ann. § 39.262(h)(3). The Commission, however, is also
authorized to convene a panel of financial experts to determine whether a control premium exists
for the retained common stock. Id. A control premium is the additional value that a block of shares
obtains by virtue of the fact that it carries with it the power to control the corporation. See Black's
Law Dictionary 1200 (7th ed. 1999). "The control premium is often computed by comparing the
aggregate value of the controlling block of shares with the cost that would be incurred if the shares
could be acquired at the going market price per share." Id.

 The utilities challenge the way that the control premium is calculated under the
Commission's rule.

 Section 39.262(h)(3) of PURA specifically provides:


The [C]ommission may accept the market valuation to conclusively establish the
value of the common stock equity in each transferee corporation or convene a
valuation panel of three independent financial experts to determine whether the
percentage of common stock sold is fairly representative of the total common stock
equity or whether a control premium exists for the retained interest. . . . If the panel
determines that a control premium exists for the retained interest, the panel shall
determine the amount of the control premium, and the [C]ommission shall adopt the
determination but may not increase the market value by a control premium greater
than 10 percent.



Tex. Util. Code Ann. § 39.262(h)(3) (emphasis added). The Commission's rule, however, provides:



If the panel determines that a control premium exists for the retained interest, the
panel shall determine the amount of the control premium, and the [C]ommission
shall adopt the determination, but may not use the control premium to increase the
value of the assets by more than 10%.



16 Tex. Admin. Code § 25.263(f)(1)(C)(v) (emphasis added). The utilities argue that the statute only
allows the Commission to apply the control premium to increase the value of the retained common
stock equity by up to ten percent. They claim that the rule is invalid because it instead allows the
Commission to apply the control premium to increase by up to ten percent the value of all the
corporation's assets. (15) The Commission responds that while the statute prohibits it from
"increas[ing] the market value by a control premium greater than 10 percent," see Tex. Util. Code
Ann. § 39.262(h)(3), the statute does not specify "[ten] percent" of what and that we should defer
to its interpretation.

 We may not add words to a statute unless necessary to give effect to legislative intent. 
Southwestern Life Ins., 24 S.W.3d at 583. The Commission essentially asks us to add the words "of
all the corporation's assets" to the end of the statutory phrase "by a control premium no greater than
10 percent." But the meaning of the phrase is unmistakable without such an addition. Because a
control premium represents value added to a retained block of shares, a "control premium of ten
percent" would naturally increase the value of the retained block of shares by ten percent. Similarly
the phrase "by a control premium no greater than 10 percent" is limited to increasing the value of
the retained block of shares by no more than ten percent. We agree with the utilities that the
Commission exceeded its authority by enacting the portion of its rule that would apply the control-premium cap to all of the corporation's assets.


B. "Other Admitted Evidence"

 Reliant also complains that the rule impermissibly allows the Commission to second-guess the findings of the valuation panel. Chapter thirty-nine, section 39.262(h)(3) requires a
valuation panel consisting of three financial experts chosen from the top ten nationally recognized
investment banks with demonstrated experience in the electric industry of the United States. Tex.
Util. Code Ann. § 39.262(h)(3). It then provides, "[i]f the panel determines that a control premium
exists for the retained interest, the panel shall determine the amount of the control premium, and the
commission shall adopt the determination [subject to the ten-percent cap]." Id. (emphasis added). 
The statute further provides that "the determination of the commission based on the finding of the
panel conclusively establishes the value of the common stock in each transferee corporation." Id. 
Rule 25.263, however, states that the Commission is to determine the value of the common stock
of the transferee corporation "based on the findings of the Commission and other admitted
evidence." See 16 Tex. Admin. Code 25.263(f)(1)(C)(vii) (2002) (emphasis added).

 The Commission argues that the language "other admitted evidence" was intended
only to allow for consideration of evidence relating to issues other than the panel's substantive
finding, such as the Commission's obligation to reduce any control premium by ten percent, or to
ensure that the panel was properly constituted in accordance with the statute. See Tex. Util. Code
Ann. § 39.262(h)(3). It claims that if the rule is applied in a way that fails to respect the panel's
determination, the proper place to challenge it is at the true-up proceeding.

 By requiring that the Commission "shall adopt" the panel's control-premium
determination, the legislature signaled its intent that the valuation of the panel be conclusive. The
extra-statutory language of the rule, as written, allows the Commission to consider whatever
evidence it chooses to increase the value of the common stock. The Commission cannot simply
confer this authority on itself without legislative approval. See Ford Motor Co. v. Motor Vehicle Bd. 
21 S.W.3d 744, 764 (Tex. App.--Austin 2000, pet. denied) (an agency "may not, on a theory of
necessary implication from a specific power, function, or duty expressly delegated, erect and exercise
a new or additional power or a power that contradicts the statute").

 The Commission is also wrong to contend that Reliant's complaint is not properly
brought as a validity challenge. It cannot promulgate a rule granting to itself a power in
contradiction of its legislative mandate, and then claim that because it intends to interpret the rule
narrowly that the issue is somehow one of application and not validity. We sustain the challenge to
this portion of the rule. (16)


Interest

 A utility found to have stranded costs at the true-up proceeding must either securitize
those costs or recover them over time through nonbypassable rates. See Tex. Util. Code Ann.
§ 39.262(c); 16 Tex. Admin. Code § 25.263(l)(2)(A) (2002). For a utility that does not securitize
its stranded costs, full recovery may take a number of years. Rule 25.263 provides that if a utility
is found to have stranded costs at the true-up proceeding, then its unbundled transmission and
distribution affiliate "shall be allowed to recover . . . carrying costs [i.e., interest] on the true-up
balance." See 16 Tex. Admin. Code § 25.263(l)(3) (2002). Because of the time value of money, this
interest represents a portion of the "net, verifiable, nonmitigable stranded costs" that the utility is
entitled to recover under chapter thirty-nine. See generally Tex. Util. Code Ann. § 39.252(a). The
rule further provides that interest shall be calculated from the date that the final true-up order is
issued until stranded costs are fully recovered. See 16 Tex. Admin. Code § 25.263(l)(3).

 The utilities argue that the rule's provision for interest is deficient. They claim that
interest should be calculated to accrue from January 1, 2002, the first day of competition, because
this is when costs became "stranded." The Commission rejoins that stranded costs do not magically
arise on the first day of competition, but, for purposes of stranded-cost recovery under chapter thirty-nine, come into existence only after the true-up proceeding. We agree with the Commission.

 The true-up proceeding determines whether a utility has any actual stranded costs. 
See Tex. Util. Code Ann. § 39.201(l), .262(c). At that time, the Commission is to determine a
utility's stranded costs by comparing the market value of the utility's generation assets with their
book value. The utilities attach some significance to the fact that the stranded-cost calculation is to
use the book value of December 31, 2001--the last day of regulation. See Tex. Util. Code Ann. §
39.251(7). They contend that this indicates that the true-up proceeding actually determines the
amount of stranded costs that existed on the first day of competition. This contention is false. While
the book value to be used by the Commission at the true-up proceeding is to be determined as of
December 31, 2001, its calculations are to be based on the market value as determined in the
proceeding. See id. § 39.262(h). This market value may fluctuate widely between the first day of
competition and the date of the true-up proceeding. Moreover, a formerly regulated utility enters the
first day of competition with its preexisting customer base intact, i.e., the utility's affiliated retail
electric provider inherits the retail customers in the former utility's service area. In the first few
years of competition--before the 2004 true-up proceeding--a utility can take steps to increase the
market value of its generation assets by simply participating in the market. (17) 

 That the legislature chose the last day of regulation as the day for measuring book
value is inconsequential. After competition is introduced, a utility no longer accrues "book value,"
because such a concept is meaningless outside of the former regulatory system. We reject the
utilities' argument that their actual stranded costs all accrued on the first day of competition.

 Reliant makes an additional argument that interest on at least a portion of its
recoverable stranded costs should accrue from the first day of competition. It claims that "[t]o the
extent Reliant . . . has stranded costs in 2004, the Commission's 2001 stranded-cost estimates [which
resulted in reversal of Reliant's earlier mitigation efforts] will have been incorrect" and Reliant will
have been deprived of the opportunity to recover its stranded costs through early mitigation. See
generally Tex. Util. Code Ann. §§ 39.201(d)-(l), .254, .256. It therefore contends that interest on
any stranded costs attributable to reversed mitigation should accrue from the time that it is required
to issue excess mitigation credits. This argument lacks merit. The duty to utilize the statute's
mitigation procedures was predicated on stranded-cost estimates, see id., and a utility's right to fully
recover its stranded costs does not encompass a right to early mitigation. (18) See id. 39.252(a).

 AEP also argues that providing for interest to accrue only from the date of the final
order is arbitrary and capricious because orders affecting different utilities will likely be issued on
different dates. This argument also lacks merit. Normal "regulatory lag" is considered to be an
element of risk borne by a utility. See State v. Public Util. Comm'n, 883 S.W.2d. 190, 196 (Tex.
1994). The utilities therefore are not entitled to revenues lost due to the time it takes to conduct the
true-up proceeding. 

 We overrule the utilities' issues challenging section 25.236(l)(3) of the Commission's
competition rule and hold that the Commission's provision for interest is adequate to provide the
utilities with full recovery of their stranded costs.


Failure to Reduce Potential Stranded Costs

 Because recoverable stranded costs are determined according to the market value of
generation assets as measured in the 2004 true-up proceeding, any move that increases the market
value of these assets before the true-up proceeding will potentially reduce a utility's stranded-cost
recovery. For utilities with significant unrecovered book value there will be no competitive-market
incentive to maintain or increase the market value of their assets until after the true-up proceeding.

 Chapter thirty-nine addresses this lack of market incentive by creating a statutory
incentive. It provides that utilities are only allowed to recover stranded costs that are
"nonmitigable," see Tex. Util. Code Ann. § 39.252(a), and requires "an electric utility . . . [to] pursue
commercially reasonable means to reduce its potential stranded costs, including good faith attempts
to renegotiate above-cost fuel and purchased power contracts or the exercise of normal business
practices to protect the value of its assets." See id. § 39.252(d). To enforce this requirement the
legislature mandated that "the [C]ommission shall consider the utility's efforts under this subsection
when determining the amount of the utility's stranded costs; provided, however, that nothing in this
section authorizes the [C]ommission to substitute its judgment for a market valuation of generation
assets determined under Sections 39.262(h) and (i)." Id. 

 Rule 25.263(e)(4) implements this section. It provides that the Commission will
determine at the true-up proceeding whether the utility, through its unbundled successor affiliates,
has pursued commercially reasonable means to reduce its stranded costs. It further provides that if
the [C]ommission finds that a utility's successor affiliates "have failed, individually or in
combination, to fully comply with their obligations under PURA § 39.252(d), the [C]ommission may
reduce the net book value of the . . . [affiliated power generation company's] generation assets or
take other measures it deems appropriate in the true-up proceeding filed under this section." See 16
Tex. Admin. Code § 25.263(e)(4) (2002).

 AEP and Reliant each challenge this portion of the rule, but on different grounds. 
AEP claims that a utility's duty to reduce its potential stranded costs ended once it unbundled into
successor affiliates, while Reliant argues that the Commission lacks the authority to reduce the book
value of generation assets. We reject both arguments.

 AEP claims that unbundled power generation companies and retail electric providers
are not required to reduce their potential stranded costs. It argues that these successor affiliates have
no such duty because section 39.252(d) imposes the duty on "[a]n electric utility" and PURA's
general definition of electric utility specifically excludes power generation companies and retail
electric providers. See Tex. Util. Code Ann. § 31.002(6). This argument cannot survive close
scrutiny because it requires us to construe portions of the statute in isolation and would lead to
absurd results. See Southwestern Life Ins., 24 S.W.3d at 583-85.

 Section 39.252(a) grants the right to recover stranded costs to "an electric utility."
Tex. Util. Code Ann. § 39.252(a). Section 39.252(d) imposes the duty to pursue commercially
reasonable means to reduce potential stranded costs on "an electric utility," and requires the
commission to consider "the utility's" efforts when determining the amount of stranded costs, i.e.,
when conducting the true-up proceeding. Id. § 39.252(d). These subsections all affect the stranded-cost calculation to take place at the true-up proceeding. Yet at the true-up proceeding, "an electric
utility" is to collect its stranded costs through its successor affiliates. See id. § 39.262(c) (". . . each
transmission and distribution utility, its affiliated retail electric provider, and its affiliated power
generation company shall jointly file to finalize stranded costs . . . ."). The "electric utility's"
stranded costs are calculated according to the market value of the generation assets owned by its
successor power generation company. See id. § 39.262(h), (i). It is apparent from these sections that
when the legislature was discussing stranded-cost recovery it sometimes used the term "electric
utility" to refer to an integrated utility's successor affiliates.

 Moreover, AEP's reading would lead to absurd results. As discussed above, section
39.252(d) imposes on an electric utility the statutory duty to try to reduce stranded costs as a
substitute for market incentive. As discussed above, until the true-up proceeding, no utility with
significant book value will have any market incentive to increase or maintain the value of its
generation assets because any move to do so will correspondingly reduce its stranded-cost recovery. 
The unbundling of a utility into successor affiliates does not affect this lack of incentive. We decline
to attribute to the legislature the intent to make such an arbitrary distinction.

 Reliant attacks the rule on another basis. The rule allows the Commission to reduce
the book value of a utility's generation assets if its successor affiliates have not pursued
commercially reasonable means to reduce potential stranded costs. See 16 Tex. Admin. Code
§ 25.263(e)(4) (2002). According to Reliant, the legislature's "obvious purpose" in prohibiting the
Commission from substituting its judgment for the market valuation of generation assets is to ensure
that the true-up calculation yields an accurate stranded-cost number. Reliant argues that by allowing
the Commission to adjust book value, the rule circumvents the statutory goal of calculating an
accurate stranded-cost amount. We disagree.

 We note initially that the relevant statutory goal is not calculating an accurate
stranded-cost amount, but calculating an accurate "verifiable, non-mitigable stranded cost[]" amount. 
Tex. Util. Code Ann. § 39.252(a) (emphasis added). Compliance with the duty to pursue
commercially reasonable means to mitigate its potential stranded costs is part of what makes
stranded costs non-mitigable. See id. § 39.252(a), (d). Reliant's interpretation is likely to yield
inaccurate determinations of non-mitigable stranded costs.

 Nothing in the statute explicitly prohibits the Commission from reducing a utility's 
book value if it finds that it or its successor affiliates have failed to comply with their obligation to 
attempt to reduce stranded costs. In fact, the statute implies that just such an adjustment should take
place. As noted, section 39.252, subsection (d) requires the Commission to consider a utility's
attempts to comply with this obligation when determining a utility's stranded costs at the true-up
proceeding. See id. § 39.252(d). Because this same subsection further provides that the Commission
is prohibited from adjusting the market value of the generation assets as determined under section
39.262(h) and (i), see id, it impliedly contemplates some sort of adjustment to book value--the only
other component of stranded costs. We overrule the utilities' challenge to section 25.263(e)(4) of
the Commission's rule.


CONCLUSION

 The Commission erred in promulgating that portion of its rule which unqualifiedly
allows a negative stranded-cost calculation to offset other amounts a utility may become entitled to
at the true-up proceeding. The statutory duty to see that a utility does not over-recover its stranded
costs justifies netting a negative stranded-cost number against the other true-up amounts only to the
extent that it reverses an actual over-recovery due to securitization. The Commission also erred in
promulgating those portions of its rule which, in setting out the partial stock valuation method, (1)
allow it to apply the ten-percent control-premium cap to the value of all corporate assets, and (2)
allow it to second-guess the valuation of the panel by considering other admitted evidence. We
reverse these portions of the rule and remand them to the Commission for further proceedings
consistent with this opinion. We find the other challenged portions of the rule to be valid and uphold
them as enacted.


ON REHEARING

 The utilities filed motions for rehearing asking that we clarify certain portions of our
opinion and substantively change other portions. We grant the motions for purposes of clarification
only and substitute modified pages. We overrule the motions insofar as they request that we change
our holding. Our opinion and holding remain substantively unchanged.



 

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed in Part; Reversed and Remanded in Part

Filed: February 6, 2003

1. In addition to the Commission, several intervenors argue in support of the rule. They
include the Office of Public Utility Counsel (OPUC), the Steering Committee for Cities Served by
TXU Electric and Central Power and Light Company (SCC), Texas Industrial Energy Consumers
(TIEC), the State of Texas, and the Alliance for Retail Markets (ARM). TXU Electric Company was
also a party to this appeal but it has since settled with the Commission and filed a motion to dismiss. 
We have granted TXU's motion and dismissed its claims.
2. The utilities could recoup, among other things, the following expenses if reasonably
incurred: 



 operation and maintenance costs incurred in furnishing normal service and
in maintaining plants




 assessed taxes 




 fuel and purchased power costs 



 ordinary advertising costs 




 post-retirement benefit-plan costs

 costs of certain assets through depreciation 



See 16 Tex. Admin. Code §§ 25.231, .235(a) (2002).
3. These utilities were identified in an April 1998 Commission Report to the Texas Senate
Interim Committee on Electric Utility Restructuring. In making these estimates, the Commission
utilized an "Excess Cost Over Market" computer model (ECOM model).
4. See generally Tex. Pub. Util. Comm'n, Application of Reliant Energy, Incorporated for
Financing Order to Securitize Regulatory Assets and Other Qualified Costs, Docket No. 21655
(2000); Tex. Pub Util. Comm'n, Application of Central Power and Light Company for Financing
Order to Securitize Regulatory Assets and Other Qualified Costs, Docket No. 21528 (2000); Tex.
Pub. Util. Comm'n, Application of Reliant Energy for Approval of Unbundled Cost of Service Rate
Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule § 25.344, Docket No.
22355 (2001); Tex. Pub. Util. Comm'n, Application of Central Power and Light Company for
Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility
Commission Substantive Rule § 25.344, Docket No. 22352 (2001).
5. See generally Tex. Pub. Util. Comm'n, Application of Reliant Energy for Approval of
Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission
Substantive Rule § 25.344, Docket No. 22355, p. 139; Tex. Pub. Util. Comm'n, Application of
Central Power and Light Company for Approval of Unbundled Cost of Service Rate Pursuant to
PURA § 39.201 and Public Utility Commission Substantive Rule § 25.344, Docket No. 22352,
p. 120.
6. The ECOM model remains applicable in 2004 only to the extent that a utility has nuclear
assets that are not susceptible to market valuation under the methods described in PURA section
39.263(h). See Tex. Util. Code Ann. § 39.262(i) (West Supp. 2003).
7. 
 
 §§ 

8. - '
 
 " " § 
 § 
9. 
 
 - § 
 § 
10. Regulatory assets are a subset of generation-related costs incurred by a utility. See City
of Corpus Christi v. Public Util. Comm'n, 51 S.W.3d 231, 238 (Tex. 2001)
. They arise when the
regulatory regime requires that a utility's right to recover an expenditure be deferred over several
years. See id. The right to recover this income stream in future years is carried on the utility's books
as a regulatory asset. See id. Regulatory assets therefore have no market value absent a regulatory
regime that assures their recovery. See id.
11. We reject the Commission's contention that the utilities' complaints are not properly
brought as validity challenges because there may exist some hypothetical set of facts where the type
of harm that the utilities predict might not actually occur. The utilities properly challenge the rule's
validity by arguing that several of its mandatory provisions were promulgated without statutory
authority. City Pub. Serv. Bd. v. Public Util. Comm'n, No. 3-00-007-CV, slip op. at 8, 2002 Tex.
App. LEXIS 2059, at *12 (Tex. App. Austin--Mar. 21, 2002, no pet.). ("In order to be invalid, the
1999 Rule must, on its face, contravene the legislative grant of power.")
12. 
 - -
 - 
 - 
 
13. Reliant claims that failure to take this reduction of book value into account causes the
Commission to inaccurately catagorize the bond proceeds as an over-recovery. Reliant also argues
that by netting the amounts that a utility received when it sold securitization bonds against other
amounts it is due, the Commission accomplishes indirectly what it is directly prohibited from doing
by statute. This argument is misconceived. Chapter thirty-nine makes securitization financing
orders irrevocable and prohibits the Commission from adjusting the transition charges in order to
assure payment to bondholders and allow the bonds to be issued on more favorable terms. See Tex.
Util. Code. Ann. §§ 39.301, .304, .306, .307 (West Supp. 2003). Transition charges flow to the
bondholders to retire the transition bonds by paying all the principal and interest. See id.; City of
Corpus Christi, 51 S.W.3d at 239. Nothing in chapter thirty-nine guarantees that a utility can keep
bond proceeds to which it is not entitled.
14. In view of our disposition of this issue, we need not address the utilities' equal-protection
arguments. See Tex. R. App. P. 47.1 (opinions must be as brief as practicable). Similarly, we do
not specifically reference the arguments of the several intervenors on this issue because they do not
differ materially from those of the Commission. See id. Throughout our opinion, we discuss the
arguments of the intervenors only when they differ materially from those of the Commission.
15. As explained above, under the partial stock valuation method a corporation's common
stock represents only a portion of the total value of its assets. See Tex. Util. Code Ann.
§ 39.262(h)(3); 16 Tex. Admin. Code § 25.263(f)(1)(C). Of course, the retained portion of that stock
represents an even smaller portion of the total value of its assets. See id.
16. Intervenors TIEC, SCC, and OPUC argue that the challenged portion of the rule is valid
because the Commission can choose not to convene a valuation panel at all, in which case it must
consider "other admitted evidence" in order to determine market value. They argue that, in light of
this discretion, the statutory requirement that the Commission's determination be "based on the
finding of the panel" means only that the panel's determination is to provide a basis, but not
necessarily the sole basis, for the Commission's interpretation. We disagree. The challenged portion
of the rule only applies if the Commission chooses to convene a valuation panel. Moreover, the
statute is clear that when a panel is convened, its determination is to be conclusive. See Tex. Util.
Code. Ann. § 39.262(h)(3). On the intervenors' interpretation, the requirement that the
Commission's determination be "based on the findings of the panel" would be superfluous given the
fact that it follows a requirement that the Commission "shall adopt" the panel's determination. See
Texas Workers' Compensation Ins. Fund v. Del Industrial, Inc., 35 S.W.3d. 591, 593 (Tex. 2000)
("A cardinal rule of statutory construction is that each sentence, clause and word is to be given effect
if reasonable and possible.").
17. For example a utility may upgrade a plant or successfully renegotiate an above-cost fuel
contract. Cf. Tex. Util. Code Ann. § 39.251(7) (requiring that "above market purchased power
costs" be considered in any stranded-cost calculation).
18. We also reject Reliant's claim that interest on the capacity auction true-up amount should
accrue from the first day of competition. We have held that the capacity auction true-up amount is
not a component of stranded costs.